## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| ZECHARIAH JONES, | **Case No.: 1:23-cv-00244** |
| Plaintiff, | **COMPLAINT AND JURY TRIAL DEMAND** |
| v. | |
| EQUIFAX INFORMATION SERVICES, LLC; SHEFFIELD FINANCIAL; and SSFCU, | |
| Defendants. | |

Zechariah Jones ("Plaintiff" or "Mr. Jones") brings this action on an individual basis, against Equifax Information Services, LLC ("Equifax"), Sheffield Financial, LLC ("Sheffield"), and Security Service Federal Credit Union ("SSFCU") and states as follows:

## <u>INTRODUCTION</u>

1.    Plaintiff, an identity theft victim, brings this action against Defendants for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et. Seq.*

2.    More than twenty million people, just under 10% of all adult

Americans, are victims of identity theft each year.[1]  Federal Law requires that each consumer reporting agency ("CRA") protect victims by taking steps to remove fraudulent information from victims' reports, to ensure that only third parties with permissible purposes see victims' reports and to implement fraud alerts and security freezes at victims' requests.  This lawsuit arises from Defendant's refusal to comply with these statutory requirements and resulting failure to protect Plaintiff from identity theft and identity theft consequences.

3.    The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

4.    However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and

---

[1] <u>Victims of Identity Theft, 2018</u>, 1. U.S. Dept. of Justice, Bureau of Justice Statistics.  April 2021, NCJ 256085.

do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

5.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

6.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

7.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

8.      One of the primary purposes in requiring CRAs to assure "maximum

possible accuracy" of consumer information is to ensure the stability of our banking

system:

> The banking system is dependent upon fair and accurate credit
> reporting. Inaccurate credit reports directly impair the efficiency of the
> banking system, and unfair credit reporting methods undermine the
> public confidence which is essential to the continued functioning of the
> banking system.

See 15 U.S.C. § 1681(a)(1).

9.     The preservation of one's good name and reputation is also at the heart

of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the
> establishment of all sorts of computerized data banks, the individual is
> in great danger of having his life and character reduced to impersonal
> "blips" and key-punch holes in a stolid and unthinking machine which
> can literally ruin his reputation without cause, and make him
> unemployable or uninsurable, as well as deny him the opportunity to
> obtain a mortgage or buy a home. We are not nearly as much concerned
> over the possible mistaken turn-down of a consumer for a luxury item
> as we are over the possible destruction of his good name without his
> knowledge and without reason. Shakespeare said, the loss of one's good
> name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec.
36570 (1970)] (emphasis added).

10.     The FCRA also requires CRAs to conduct a reasonable reinvestigation

to determine whether information disputed by consumers is inaccurate and record

the current status of the disputed information, or delete the disputed information,

before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

11.    In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

12.    The FCRA also requires Furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

13.    Plaintiff's claims arise out of the Defendants plainly deficient reinvestigations considering Plaintiff's multiple disputes and repeated notice that he was a victim of identity theft.

14.    Accordingly, Plaintiff brings claims against Defendant Equifax, for

failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of identity theft, and for failing to delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i, and for failing to follow to include a fraud alert at the time of Plaintiff's request, for failing to apply an appropriate fraud alert in conformity with Plaintiff's request, and for failing to block the identity theft items as disputed and supported by Plaintiff in violation of the FCRA, 15 U.S.C. §§ 1681c-1 and 1681c-2.

15.     Further, Plaintiff also brings claims against two Furnishers, Defendants Sheffield Financial and SSFCU, for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of identity theft, and for failing to delete the disputed information from Plaintiff's credit file, in violation of FCRA, 15 U.S.C. § 1681s-2b.

16.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs, and attorneys' fees from the Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## I.  JURISDICTION AND VENUE

17.    This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the FCRA, a federal law. *See* 15 U.S.C. § 1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendants regularly transacts business within this District, are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## II.  PARTIES

19.    Zechariah Jones ("Plaintiff" or "Mr. Jones") is a natural person residing in Austin, Texas, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

20.    Defendant Equifax Information Services, LLC ("Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of Texas, including within this District.

21.    Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing

consumer reports, as defined in 15 U.S.C. § 1681a(d)) to third parties.

22.    The information that Equifax collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans.  Equifax also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

23.    Equifax collects and maintains such information about consumers, whether consumers like it or not.  Consumers do not have a choice as to whether Equifax collects and maintains information about them.  Not only that, but consumers cannot remove information that Equifax collects and maintains about them from the Equifax database.  Further, Equifax sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that Equifax sold.

24.    Defendant Sheffield Financial, LLC ("Sheffield") is a limited liability company with a principal place of business located at 2554 Lewisville-Clemmons Road, Clemmons, NC 27012, and is authorized to do business in the State of Texas, including within this District.

25.    Sheffield is a "Furnisher" as defined in 12 CFR 1022.41. Sheffield

regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report.    A data furnisher, such as Sheffield, is an entity that reports information about consumers to consumer reporting agencies (CRAs), which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc.  Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. §1681s-2b of the FCRA.

26.    Defendant Security Service Federal Credit Union ("SSFCU") is a credit union with a principal place of business located at 16211 La Cantera Pkwy, San Antonio, TX 78256, and is authorized to do business in the State of Texas, including within this District.

27.    SSFCU is a "Furnisher" as defined in 12 CFR 1022.41. SSFCU regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report.    A data furnisher, such as SSFCU, is an entity that reports information about consumers to consumer reporting agencies (CRAs), which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc.  Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. §1681s-2b of the FCRA.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

28.    The FCRA governs the conduct of consumer reporting agencies to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

29.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

30.    Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.  *See* 15 U.S.C. § 1681(b).

31.    Congress also recognized that CRAs such as Equifax "have assumed a vital role in assembling and evaluating consumer credit and other information on consumers." 15 U.S.C. § 1681(a)(3).  Therefore, Congress determined that there "is a need to insure that consumer reporting agencies exercise their grave

responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy."  15 U.S.C. § 1681(a)(4).

32.    For that reason, Congress ensured that the FCRA also provides special protections for victims of identity theft.

33.    The first form of protection is the "block."  When a consumer identifies any information in their credit file that is the product of identity theft, the CRA **must** block (delete) the reporting of that information within four business days, provided the consumer submits:

a.    Appropriate proof of the identity of the consumer;

b.    A copy of an identity theft report;

c.    The identification of such information by the consumer; and,

d.    A statement by the consumer that the information is not information relating to any transaction by the consumer.

15 U.S.C. § 1681c-2(a).15 U.S.C. § 1681c-2(a).

34.    The second form of protection the FCRA provides for identity theft victims is the "fraud alert."

35.    Specifically, upon request of the consumer, a CRA **must** place an "initial fraud alert" in the file of that consumer, and provide that alert along with any credit score generated in using that file, for one year beginning on the date of the

request.  Unless one year has passed, the CRA can only remove the alert if the consumer requests removal and the CRA receives "appropriate proof of the identity of the requester." 15 U.S.C. § 1681c-1(a)(1).

36.    The third form of protection the FCRA provides for identity theft victims is a "security freeze," which a consumer can request from nationwide CRAs such as the Defendant here.

37.    A security freeze prohibits a CRA from disclosing the contents of a consumer report that is subject to the freeze to any person requesting the consumer report.[2]  15 U.S.C. § 1681c-1(i)(1).  Stated otherwise, if a consumer's report is frozen, a CRA will not be able to sell it to creditors assessing credit applications from identity thieves using an affected consumer's identity.

38.    Once placed, a security freeze does not expire.  A CRA can remove a security freeze only at "the direct request of the consumer," or if it finds that the freeze "was placed due to a material misrepresentation of fact by the consumer." 15 U.S.C. § 1681c-1(i)(3)(A).  Furthermore, when a consumer requests removal, the CRA must first obtain "proper identification" from the consumer before removing the freeze."  15 U.S.C. § 1681c-1(i)(3)(C).

---

[2] Certain statutorily exempt entities can still request and receive a frozen report. See 15 U.S.C. § 1681c-1(i)(4).  But those exemptions do not apply to the matter at hand.

39.    The fourth and final form of protection the FCRA provides for identity theft victims is that even in the absence of a security freeze, a CRA may **only** release a consumer report to a person "which it has reason to believe...intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished..." 15 U.S.C. § 1681b(a). When a credit transaction is not initiated by the consumer, a CRA may only release the consumer's report with the consumer's authorization or if the user is making a firm offer of credit.  15 U.S.C. § 1681b(c).  No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a permissible purpose.  15 U.S.C. § 1681e(a).

40.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

41.    Similarly, the FCRA also imposes a duty upon the Furnishers, such as Sheffield Financial and SSFCU, to reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies. (15 U.S.C. §

1681s-2b).

42.    The FCRA provides consumers with a private right of action against consumer reporting agencies, such as Equifax, and data furnishers such as Sheffield Financial and SSFCU, that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## FACTUAL ALLEGATIONS
### *Identity Theft Incident*

43.    Plaintiff has subscribed to a credit monitoring service for a number of years as a common-sense precautionary measure given the widely publicized data breaches of the not-so-distant past.

44.    In August 2021, Plaintiff's credit monitoring service alerted him to the fact that someone had submitted credit applications to Sheffield Financial, SSFCU, and OneMain.

45.    Plaintiff had not submitted a credit application in August 2021 to Sheffield Financial, SSFCU, or OneMain.

46.    Plaintiff reasonably believed that those credit applications were the product of identity theft.

47.    On August 30, 2021, Plaintiff contacted and spoke to a representative at Sheffield Financial, SSFCU, and OneMain and disputed the inquiry on his credit file and identified any alleged application as fraudulent and the product of identity

theft.

48.     During his dispute with SSFCU, Plaintiff spoke with Austin in the SSFCU fraud department and learned that Loan Application #4890373 was in progress.   Specifically, that the loan application was submitted to finance the purchase of a sea doo from Kent Sports in San Antonio, Texas.

49.     During his dispute with Sheffield Financial, Plaintiff spoke with Collin, the Supervisor in the Sheffield Financial Loan Processing Department and learned that the loan had been approved but not funded.

50.     During his dispute with OneMain, Plaintiff spoke with Jared in the OneMain Fraud Department and reported the credit application as the product of identity theft to ensure that OneMain would deny and not fund the loan.

51.     Plaintiff immediately contacted Kent Sports and alerted them to the fact that someone had impersonated him and submitted a fraudulent application that was the product of identity theft in his name without his knowledge or authorization.

52.     To verify his identity and establish that he *did not* apply for credit at that Kent Sports, Plaintiff immediately provided a copy of his driver's license and provided information to establish that the submitted application was fraudulent and the product of identity theft.

53.     The Kent Sports representative confirmed Plaintiff's suspicion and fear

that earlier that day a consumer ("the identity thief") represented that he was Plaintiff. Specifically, the identity thief applied for financing to purchase a sea doo.

54.    Further, the identity thief was expected to return the very next day to pick up the sea doo.

55.    Due to Plaintiff's quick action and effort, local authorities apprehended the identity thief at Kent Sports the very next day.

56.    The identity thief was prosecuted and is currently still serving the sentence for the aforementioned crime.

### *Plaintiff's First Dispute to Equifax*

57.    On or about August 31, 2021, Plaintiff sent a written dispute letter to Equifax. Specifically, Plaintiff disputed the Sheffield Financial, SSFCU, and OneMain inquiries that were the product of identity theft and published by Equifax. Plaintiff identified himself as an identity theft victim, asked Equifax to delete the aforementioned inquiries and to send to Plaintiff an updated copy of his credit file.

58.    Further, in the August 31, 2021, dispute to Equifax, Plaintiff specifically informed Equifax that "the identity thief responsible for the inquiries has been arrested and is in custody. The police report number is Selma TX Police Dept. Case #21-18911."

59.    On the face of the August 31, 2021, dispute letter, and to ensure Equifax

had the information necessary to identify Plaintiff and locate his file, Plaintiff provided his current mailing address, email address, social security number, date of birth, and phone number.

60.    Plaintiff's August 31, 2021, provided Equifax with sufficient information to identify his credit file and sufficient information to support his dispute.

61.    On September 2, 2021, Plaintiff submitted a direct written dispute to SSFCU.

62.    Equifax received Plaintiff's September 2021 dispute letter which disputed the inquiries by Sheffield Financial, SSFCU, and OneMain due to identity theft.

63.    On September 8, 2021, Plaintiff spoke with Colin at Sheffield Financial to follow up on his dispute regarding the identity theft.  That same day, Plaintiff faxed documents to Sheffield Financial in support of his dispute.  Specifically, Plaintiff faxed a notarized ID Theft Affidavit, a copy of his Driver's License, the Police Report, and his dispute letter.  That same day, Plaintiff also mailed the same to Sheffield Financial.

64.    On September 8, 2021, Equifax issued a letter to Plaintiff in response to Plaintiff's dispute.

65.    In that letter, Equifax acknowledged that Plaintiff's dispute was of "fraudulent items" on Plaintiff's credit report and represented that a fraud alert was added to Plaintiff's credit file.

66.    Despite Plaintiff's clear dispute that he was a victim of identity theft and identification of the identity theft inquiries, and despite the fact that Equifax represented that it had added a fraud alert to Plaintiff's file and acknowledged his dispute was of fraudulent items, Equifax's response asked Plaintiff to *resubmit* his dispute along with documents verifying his current address and identification.

67.    Equifax failed to reinvestigate Plaintiff's August 31, 2021 dispute and remove the identity theft markers, including the specifically disputed inquiries by Sheffield Financial, SSFCU, and OneMain.

### *Plaintiff's Second Dispute to Equifax*

68.    On September 9, 2021, Plaintiff received a voicemail from Jennifer at Sheffield Financial wherein she confirmed receipt of Plaintiff's notarized ID Theft Affidavit, a copy of his Driver's License, the Police Report, and his dispute letter. She represented that the same would be forwarded to the dispute department which should be processed within 10-14 days.

69.    On September 24, 2021, Plaintiff sent another dispute letter to Equifax. And in response to Equifax's request for documentation establishing his identity,

Plaintiff enclosed a copy of the Certified Police Report, his driver's license, his social security card, and the FTC Identity Theft Affidavit. In his September 24, 2021 dispute to Equifax, Plaintiff specifically referenced his prior August 31, 2021 dispute, restated that he was a victim of identity theft, identified specifically the Sheffield Financial, SSFCU, and OneMain inquiries as the product of fraud, and asked Equifax to "remove the fraudulent inquiries from my report."

70.    Further, in the September 24, 2021 dispute to Equifax, Plaintiff specifically informed Equifax that "the identity thief responsible for the inquiries has been arrested and is in custody.  His contact information can be found in the enclosed police report. The police report number is Selma TX Police Dept. Case #21-18911.  If confirmation is needed, please contact Selma Police Dept at 210-651-5368 and reference case #21-18911."

71.    Once again and on the face of that September 24, 2021, dispute to Equifax, and to ensure Equifax had the information necessary to identify Plaintiff and locate his file, Plaintiff provided his current mailing address, email address, social security number, date of birth, and phone number.

72.    Equifax failed to reinvestigate Plaintiff's September 24, 2021, dispute and remove the identity theft markers, including the specifically disputed inquiries by Sheffield Financial, SSFCU, and OneMain.

### *Plaintiff's Third Dispute to Equifax*

73.    On January 2, 2023, Plaintiff called Equifax and again disputed the fraudulent inquiries that were the product of identity theft.

74.    During the January 2, 2023, phone dispute, Plaintiff spoke with Gilbert, an Equifax representative.

75.    During the January 2, 2023, phone dispute, Plaintiff specifically informed the Equifax representative that he was a victim of identity theft and disputed the Sheffield Financial, SSFCU, and OneMain fraudulent inquiries.

76.    During the January 2, 2023 phone dispute, the Equifax representative noted Plaintiff's phone dispute and directed Plaintiff to dispute again in writing by mailing another dispute letter to Equifax Information Services LLC, PO Box 105069, Atlanta, GA 30348-5069.

77.    Equifax failed to reinvestigate Plaintiff's January 2, 2023 dispute and remove the identity theft markers, including the specifically disputed inquiries by Sheffield Financial, SSFCU, and OneMain.

### *Plaintiff's Fourth Dispute to Equifax*

78.    On or about January 3, 2023, Plaintiff reviewed his Equifax credit file via online portal.  Upon review, Plaintiff noted that the disputed identity theft inquiries were still on his credit file but that also some additional personally

identifying information was inaccurate.

79.    On January 3, 2023, Plaintiff disputed inaccurate information with Equifax via an online dispute.  Equifax represented to Plaintiff that it conducted and completed an investigation that same day and provided confirmation #3003568415.

80.    On January 4, 2023, Plaintiff disputed additional inaccurate information with Equifax via an online dispute.  Equifax represented to Plaintiff that it conducted and completed an investigation that same day and provided confirmation #3004544811.

81.    On January 4, 2023, Plaintiff submitted a direct email dispute to SSFCU regarding the inquiry that was the product of identity theft, and which was still reporting to his Equifax credit file.  Specifically, Plaintiff sent his email to the email address affiliated with the SSFCU Fraud Operations Department.

82.    On January 5, 2023, Plaintiff contacted Sheffield Financial and spoke with Colin.  Colin informed Plaintiff that Sheffield Financial did not have any record of his dispute any longer since it was more than a year ago.  Colin directed Plaintiff to submit another direct dispute, via email to sheffieldcreditdisputes@truist.com. On or about that same day, Plaintiff submitted an email dispute to that email address as well as customerservice@sheffieldfinancial.com.

83.    On January 5, 2023, Plaintiff placed several phone calls to speak with

someone at Sheffield Financial that would assist him with removing the inquiry that was a product of identity theft. When Plaintiff asked to speak with someone in the dispute department, a representative informed him that there was no such department. Ultimately, Plaintiff spoke with supervisor Denise who directed Plaintiff to submit another direct dispute. Accordingly, Plaintiff submitted another direct dispute and enclosed ample supporting documentation including: (1) Sheffield Dispute Response; (2) Copy of Driver's License and Social Security Card; (3) FTC ID Theft Affidavit; (4) Proof of online dispute to Equifax; (5) Communication from OneMain representing to Plaintiff that the inquiry would be removed; (6) Communication from SSFCU representing to Plaintiff that the inquiry would be removed; (7)Police Report; and, (8) Proof that Trans Union had removed the inquiries.

84.    On January 5, 2023, and pursuant to the instructions of the Equifax representative on January 2, 2023, Plaintiff sent another dispute to Equifax to again dispute the identity theft inquiries.

85.    With his January 5, 2023 dispute letter to Equifax, Plaintiff again enclosed a copy of the Certified Police Report filed with the Selma Police Department (case number 21-18911), his driver's license, his social security card, and the FTC Identity Theft Affidavit (number 139830563). Plaintiff also enclosed

correspondence received from Defendant Equifax, Defendant Equifax's extended Fraud Alert Request form, a copy of Plaintiff's current residential lease agreement establishing his current address, proof of the online dispute #3004544811, OneMain Financials' letter representing to Plaintiff that it had requested inquiry removal, SSFCU's letter representing to Plaintiff that it had requested inquiry removal (including police report), and Trans Union's confirmation that the inquiries were deemed fraudulent and removed.

86.     In his January 5, 2023, dispute to Defendant Equifax, Plaintiff specifically referenced his prior August 31, 2021 dispute, restated that he was a victim of identity theft, identified specifically the Sheffield Financial, SSFCU, and OneMain inquiries as the product of fraud.

87.     Further, in the January 5, 2023, dispute to Defendant Equifax, Plaintiff specifically informed Defendant Equifax that "the identity thief responsible for the inquiries has been arrested and is in custody.  His contact information can be found in the enclosed police report. The police report number is Selma TX Police Dept. Case #21-18911.  If confirmation is needed, please contact Selma Police Dept at 210-651-5368 and reference case #21-18911."

88.     Further, in the January 5, 2023, dispute to Defendant Equifax, Plaintiff specifically asked Defendant Equifax to "remove the three (3) fraudulent hard

inquiries from my report.  Each of these three financial institutions sent Defendant Equifax a request to remove these fraudulent inquiries back in September 2021 including proof of the fraud, yet Defendant Equifax has not removed them."

89.    In that same January 5, 2023, dispute to Defendant Equifax, Plaintiff also specifically requested that Defendant Equifax "add the fraud alert to my file and please extend the fraud alert to the maximum allowed time period."

90.    On January 6, 2023, Denise from Sheffield Financial emailed Plaintiff and confirmed receipt of Plaintiff's dispute and represented to Plaintiff that Sheffield would request of Defendant Equifax deletion of the disputed inquiry.

91.    By January 9, 2023, Defendant Equifax still had not removed the disputed fraudulent inquiries despite Plaintiff's disputes and support that he was a victim of identity theft.

92.    On January 9, 2023, Plaintiff submitted another direct dispute to SSFCU by email regarding the inquiry that was the product of identity theft, and which was still reporting to his Defendant Equifax credit file.  Specifically, Plaintiff sent his email to the email address affiliated with the SSFCU Credit Reporting Team.

93.    Due to Defendant Equifax's continued failure to reinvestigate Plaintiff's disputes and remove the disputed fraudulent information, on January 9, 2023, Plaintiff sent a block request to Defendant Equifax.

94.    Specifically on the January 9, 2023, request, Plaintiff restated that he was a victim of identity theft and that he was following up on his January 5, 2023 dispute letter.    Plaintiff noted that Sheffield Financial, SSFCU, and OneMain represented to him that they had all requested removal from his credit file of the disputed inquiries due to fraud, but that Defendant Equifax had failed to do so.

95.    As part of the January 9, 2023, request, Plaintiff requested that Defendant Equifax block the fraudulent inquiries, send to Plaintiff a corrected/updated copy of his report, and send the same to all furnishers entitled to the same.

96.    On January 9, 2023, Sheffield Financial represented to Plaintiff that it had submitted a request for deletion of the disputed fraudulent inquiry to Defendant Equifax.

97.    On January 9, 2023, Plaintiff again followed up with SSFCU by emailing the Credit Reporting Team.

98.    On January 11, 2023, Plaintiff again disputed inaccurate information with Defendant Equifax via an online dispute.    Defendant Equifax represented to Plaintiff that it conducted and completed an investigation on January 12, 2023, and provided confirmation #30125161666.

99.    On or about January 12, 2023, SSFCU represented to Plaintiff that it

had submitted a request for deletion of the disputed fraudulent inquiry to Defendant Equifax.

100.   Along with the January 12, 2023, online dispute results, confirmation #30125161666, Defendant Equifax also confirmed to Plaintiff that it had received Plaintiff's dispute letters dated January 5, 2023 and January 9, 2023.

101.   Along with the January 12, 2023, online dispute results, confirmation #30125161666, Defendant Equifax also confirmed to Plaintiff that Defendant Equifax still had not removed the disputed fraudulent inquiries by Sheffield Financial, SSFCU, and OneMain.

102.   On January 12, 2023, Defendant Equifax issued a letter to Plaintiff in response to Plaintiff's dispute and acknowledged that Plaintiff's dispute was of "fraudulent items" on Plaintiff's credit report.   In that same letter, and despite Plaintiff's clear and numerous disputes that he was a victim of identity theft and identification of the identity theft inquiries, Defendant Equifax's response asked Plaintiff to once again submit documents establishing his identity.

103.   Defendant Equifax's January 12, 2023, response to Plaintiff's numerous disputes and allegations that he was a victim of identity theft was to send a form letter.

104.   On January 12, 2023, Plaintiff reviewed his Defendant Equifax inquiry

log and noted that the Sheffield Financial, SSFCU, and OneMain inquiries were still reporting to his credit file.

105.  Defendant Equifax failed to reinvestigate Plaintiff's January 5, 2023, and January 9, 2023, and related online disputes and remove the identity theft markers, including the specifically disputed inquiries by Sheffield Financial, SSFCU and OneMain.

### *Plaintiff's Fifth Dispute to Defendant Equifax*

106.  On January 13, 2023, Plaintiff called and spoke with Defendant Equifax' Representative to follow up on his numerous prior disputes of the fraudulent inquiries by Sheffield Financial, SSFCU, and OneMain.

107.  During the January 13, 2023, call, Defendant Equifax' representative confirmed that Defendant Equifax had completed its reinvestigation and that the OneMain inquiry had been removed.

108.  During that same call, Defendant Equifax' representative informed Plaintiff that the Sheffield Financial and SSFCU inquiries were verified as accurate and would remain on Plaintiff's credit file.

109.  Further, during that same January 13, 2023, call, Defendant Equifax' representative also communicated to Plaintiff that despite his prior two requests that a fraud alert be added, a fraud alert was not added to his file.

110.   That same day, Plaintiff called Defendant Equifax's Fraud Victim Assistance Department.  During that call, Defendant Equifax' representative added a 12-month fraud alert to Plaintiff's credit file and directed him to submit new disputes for the remaining disputed inquiries by Sheffield Financial and SSFCU.

111.   On January 13, 2023, Plaintiff called Defendant Equifax and again disputed the fraudulent inquiries that were the product of identity theft.

112.   Plaintiff waited on hold for thirty-seven minutes before the call was dropped.

113.   That same day, Plaintiff called Defendant Equifax again and resumed his wait on hold until he was finally connected with Defendant Equifax' representative. During that call, which between the hold time and the time speaking with a representative lasted the better part of an hour, Defendant Equifax' representative explained that they were a supervisor and that Plaintiff's dispute would have to be handled by the "back-office team," but that Plaintiff was not allowed to speak with that team directly.

114.   Defendant Equifax' Supervisor suggested that Plaintiff's SSN card, Driver's License, and Police Report were all illegible.  This was the first time Defendant Equifax or any of its representatives had suggested that Plaintiff's enclosures were illegible.  The Supervisor explained to Plaintiff that Defendant

Equifax received his documents and then scanned them into their system and that the resulting scans proved illegible.

115.    Defendant Equifax' Supervisor created ticket #3013555895 for Plaintiff's January 13, 2023, dispute.

116.    On January 13, 2023, Plaintiff called SSFCU and spoke to Austin and again explained that he was the victim of identity theft, had previously disputed the inquiry, and that it was still reporting to his Equifax credit file.  During that call, Austin informed Plaintiff that he would follow up with the Credit Reporting Team and agreed that the inquiry should be removed as a product of identity theft.

117.    On January 13, 2023, Plaintiff emailed Denise at Sheffield Financial and informed her that Defendant Equifax represented to him that Sheffield Financial verified as accurate the disputed inquiry.

118.    On January 22, 2023, Plaintiff disputed inaccurate information with Defendant Equifax again via an online dispute.

119.    On January 24, 2023, and January 25, 2023, Plaintiff called Defendant Equifax to again request that Defendant Equifax remove the fraudulent inquiries, to no avail.

120.    On January 25, 2023, Defendant Equifax issued a letter to Plaintiff in response to Plaintiff's dispute and Defendant Equifax acknowledged that Plaintiff's

dispute was of "fraudulent items" on Plaintiff's credit report.  In that same letter, and despite Plaintiff's clear and numerous disputes that he was a victim of identity theft and identification of the identity theft inquiries, and despite the numerous communications with Defendant Equifax about his credit file, Defendant Equifax's response asked Plaintiff to once again submit documents establishing his identity.

121.    Defendant Equifax's January 25, 2023, response to Plaintiff's numerous disputes and allegations that he was a victim of identity theft was to send a form letter.

122.    On January 26, 2023, Defendant Equifax represented to Plaintiff that it conducted and completed an investigation pertaining to his online dispute submitted on January 22, 2023, and provided confirmation #3025558645.

123.    Defendant Equifax failed to reinvestigate Plaintiff's January 13, 2023, dispute and related online disputes and remove the identity theft markers, including the specifically disputed inquiries by Sheffield Financial and SSFCU.

**The Credit Bureau Defendants' Method for Considering Consumer Credit Report Disputes**

124.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

125.    The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-

OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

126.   That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."

127.   It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

128.   Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

129.   Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

130.   The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

131. These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

132. Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

133. The data furnishers, like Defendants Sheffield Financial and SSFCU, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

134. Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

### *Sheffield Financials' Unreasonable Dispute Reinvestigation*

135. For more than a year, Defendant Furnisher Sheffield Financial continued to report that Plaintiff applied for credit in or around August 2021 to

Plaintiff's Equifax credit file.

136.   Plaintiff sufficiently identified himself during his many disputes to Sheffield Financial.

137.   Plaintiff supplied ample and adequate evidence in support of his allegation that he was an identity theft victim to Sheffield Financial, including an FTC ID Theft Affidavit.

138.   Sometime in or around January 2023, Defendant Equifax notified Sheffield Financial of Plaintiff's dispute.

139.   Defendant Equifax forwarded to Sheffield Financial Plaintiff's dispute along with his documents enclosed with that dispute.

140.   Sometime in or around January 2023, Sheffield Financial responded to Defendant Equifax's dispute notification and request for reinvestigation by verifying the disputed information to Defendant Equifax as accurate as it pertained to Plaintiff.

141.   Defendant Sheffield Financial violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to remove the disputed inquiry that was the product of identity theft associated with Plaintiff's credit file.

***SSFCU's Unreasonable Dispute Reinvestigation***

142.    For more than a year, Defendant Furnisher SSFCU continued to report that Plaintiff applied for credit in or around August 2021 to Plaintiff's Equifax credit file.

143.    Plaintiff sufficiently identified himself during his many disputes to SSFCU.

144.    Plaintiff supplied ample and adequate evidence in support of his allegation that he was an identity theft victim to SSFCU, including an FTC ID Theft Affidavit.

145.    Sometime in or around January 2023, Defendant Equifax notified SSFCU of Plaintiff's dispute.

146.    Defendant Equifax forwarded to SSFCU Plaintiff's dispute along with his documents enclosed with that dispute.

147.    Sometime in or around January 2023, SSFCU responded to Defendant Equifax's dispute notification and request for reinvestigation by verifying the disputed information to Defendant Equifax as accurate as it pertained to Plaintiff.

148.    Defendant SSFCU violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to remove the disputed inquiry

that was the product of identity theft associated with Plaintiff's credit file.

***Plaintiff's Sixth Dispute to Defendant Equifax***

149.   On January 26, 2023, Plaintiff sent another dispute letter to Defendant Equifax to again dispute the identity theft inquiries.

150.   With his January 26, 2023, dispute letter to Defendant Equifax, Plaintiff again enclosed a copy of the Certified Police Report filed with the Selma Police Department (case number 21-18911), a copy of his driver's license and social security card, and the FTC ID Theft Affidavit (number 139830563).  Plaintiff also enclosed correspondence received from Defendant Equifax, Defendant Equifax' extended Fraud Alert Request form, Sheffield Financials' correspondence confirming the fraudulent nature of the disputed inquiry, and SSFCU's correspondence confirming the fraudulent nature of the disputed inquiry.

151.   The enclosed correspondence from Sheffield Financial, dated January 9, 2023, specifically stated, "we have researched this matter and determined that based on the information provided and a review of our records, the credit inquiry was invalid."

152.   Further, Sheffield Financials' correspondence went on to say, "on 01/09/2023 we submitted a request to delete the credit inquiry."

153.   The enclosed correspondence from SSFCU, dated January 12, 2023,

specifically stated, "we have completed a review of our internal account records after review of the information you provided in your stated dispute regarding a credit pull done in error due to fraud. We have found the information is due to fraud and have removed this inquiry."

154. In his January 26, 2023, dispute to Defendant Equifax, Plaintiff specifically referenced his prior August 31, 2021 dispute, restated that he was a victim of identity theft, and identified specifically the Sheffield Financial and SSFCU inquires as the product of fraud.

155. Further, in the January 26, 2023, dispute to Defendant Equifax, Plaintiff again specifically informed Defendant Equifax that "the identity thief responsible for the inquiries has been arrested and is in custody. His contact information can be found in the enclosed police report. The police report number is Selma TX Police Dept. Case #21-18911. If confirmation is needed, please contact Selma Police Dept at 210-651-5368 and reference case #21-18911."

156. In the January 26, 2023, dispute to Defendant Equifax, Plaintiff specifically asked Defendant Equifax to remove the disputed hard inquiries from his report.

157. In the January 26, 2023, dispute to Defendant Equifax, Plaintiff also again asked that Defendant Equifax "add the fraud alert to my file," and, "please

extend the fraud alert to the maximum allowed time period."

158.   On January 31, 2023, Plaintiff submitted an online dispute to Defendant Equifax. Defendant Equifax represented to Plaintiff that it conducted and completed an investigation on February 4, 2023, and provided confirmation #303554056.

159.   On February 9, 2023, Defendant Equifax issued a letter to Plaintiff in response to Plaintiff's dispute and Defendant Equifax acknowledged that Plaintiff's dispute was of "fraudulent items" on Plaintiff's credit report.  In that same letter, and despite Plaintiff's clear and numerous disputes that he was a victim of identity theft and identification of the identity theft inquiries, and despite the numerous communications with Defendant Equifax about his credit file, Defendant Equifax's response asked Plaintiff to once again submit documents establishing his identity.

160.   Defendant Equifax's February 9, 2023, response to Plaintiff's numerous disputes and allegations that he was a victim of identity theft was to send a form letter.

161.   Defendant Equifax failed to reinvestigate Plaintiff's February 9, 2023, dispute and remove the identity theft markers, including the specifically disputed inquiries by Sheffield Financial and SSFCU.

### Plaintiff's Seventh Dispute to Defendant Equifax

162.   On February 9, 2023, Plaintiff called Defendant Equifax and again

disputed the fraudulent inquiries. During that call, Plaintiff spoke with Defendant Equifax' Representative Omar.

163.   During the February 9, 2023, dispute call with Defendant Equifax' Representative Omar, Omar informed Plaintiff that only Sheffield Financial and SSFCU could have the disputed inquiries removed from his credit file.

164.   Plaintiff informed Omar that Sheffield Financial and SSFCU represented to him that they had previously requested removal of their respective inquiries that were the product of identity theft.

165.   Plaintiff asked Defendant Equifax' Representative Omar to escalate the matter to a supervisor.  During that same call, Plaintiff was connected to Defendant Equifax' Supervisor Sebastian.

166.   During that call, Sebastian confirmed he was able to view and read Plaintiff's disputes, specifically Plaintiff's January 26, 2023, dispute.

167.   However, Sebastian insisted that Plaintiff only submitted a fraud alert request on that date.

168.   Plaintiff baffled by Sebastian's statement, asked Sebastian to read a portion of the aforementioned dispute.  Sebastian's reading confirmed that the dispute requested removal of the fraudulent inquiries and clearly stated that Plaintiff was a victim of identity theft.

169.    During that call, Defendant Equifax' Supervisor Sebastian disclosed to Plaintiff that Defendant Equifax will only address one item or attachment in a dispute and ignore the rest.  Plaintiff, in disbelief, asked Sebastian to repeat that statement, and Sebastian repeated the same.

170.    Plaintiff, blindsided by the revelation, stated that he wishes he had known that was Defendant Equifax's process for dispute handling back in August 2021.

171.    Defendant Equifax failed to reinvestigate Plaintiff's February 9, 2023, dispute and remove the identity theft markers, including the specifically disputed inquiries by Sheffield Financial and SSFCU.

## PLAINTIFF'S DAMAGES

172.    Plaintiff did exactly what he should have done upon realizing he was the victim of identity theft.

173.    Plaintiff immediately contacted the potential creditors at issue, Sheffield Financial, SSFCU, and OneMain, and stopped them from releasing funds to the identity thief.

174.    Plaintiff immediately filed a police report and in fact aided the authorities in apprehending and ultimately prosecuting the identity thief.

175.    Plaintiff filed an FTC ID Theft Affidavit.

176.    Plaintiff immediately disputed with Defendant Equifax, as well as with non-parties Experian and Trans Union.

177.    Plaintiff immediately identified himself as an identity theft victim and requested a fraud alert from Defendant Equifax, as well as from non-parties Experian and Trans Union.

178.    Plaintiff even went so far as to request that the Sheffield Financial, SSFCU, and OneMain submit an inquiry deletion request to the major credit reporting agencies, including Defendant Equifax.

179.    Experian and Trans Union removed the inquiries that were the product of identity theft upon Plaintiff's initial request.  Notably, Defendant Equifax did not.

180.    Instead, Defendant Equifax repeatedly disregarded Plaintiff's credible disputes.  Often responding to a victim of identity theft with form letters requesting the same copies of identification, repeatedly, even after the Plaintiff had repeatedly provided the same.

181.    Defendant Equifax even suggested that it received Plaintiff's proofs of identity but that those proofs did not correlate to the information on Plaintiff's credit file.

182.    Defendant Equifax understands it is often the case that an identity thief's activities, often designed intentionally to fabricate information into a credit

file, will cause false information to appear on an identity theft victim's credit file.

183.    Despite Plaintiff's phone, online, and letter disputes, which when discretely counted likely exceed more than a dozen distinct notifications from Plaintiff to Defendant Equifax that the Sheffield Financial, SSFCU, and OneMain inquiries were the product of fraud and he was a victim of identity theft, Defendant Equifax hardly waivered in its refusal to remove the same.

184.    After more than a year from Plaintiff's initial dispute and from when Experian and Trans Union, Defendant Equifax's counterparts, had already removed the OneMain inquiry, finally did Defendant Equifax remove that single inquiry in 2023.

185.    Plaintiff reasonably believes that Defendant Sheffield Financial failed to have the disputed inquiry and continued to verify the inquiry as accurate to Defendant Equifax inaccurately suggesting that Plaintiff applied for credit in or around August 2021.

186.    Plaintiff reasonably believes that Defendant SSFCU failed to have the disputed inquiry and continued to verify the inquiry as accurate to Defendant Equifax inaccurately suggesting that Plaintiff applied for credit in or around August 2021.

187.    Plaintiff reasonably believes that Defendant Equifax continued to

Case 1:23-cv-00244-RP    Document 1    Filed 03/06/23    Page 42 of 61

inaccurately publish that Plaintiff applied for credit from Sheffield Financial and SSFCU in or around August 2021.

188.   As a direct result of the Defendant Equifax's ardent refusal to remove the disputed inquiries which were a product of identity theft, Defendant Equifax has continued to saddle Plaintiff with the inquiries which were the product of identity theft.

189.   Further, as a direct result of Defendant Furnisher Sheffield Financials' verification of the disputed inquiry to Defendant Equifax, Defendant Sheffield has continued to saddle Plaintiff with the inquiry which was the product of identity theft.

190.   Similarly, as a direct result of Defendant Furnisher SSFCU's verification of the disputed inquiry to Defendant Equifax, Defendant SSFCU has continued to saddle Plaintiff with the inquiry which was the product of identity theft.

191.   Due to Defendants' ardent refusal to comply with their respective obligations pursuant to the FCRA, Plaintiff was forced to obtain legal advice and counsel, for which he incurred attorney's fees.

192.   Further, and due to Defendants' inexplicable refusal to remove fraudulent inquiries from an identity theft victim's credit file, Plaintiff expended countless hours disputing the same with Defendant Equifax, Sheffield Financial, and SSFCU, repeatedly, to no avail.

193.   Defendants' conduct disrupted Plaintiff's life to the degree where Plaintiff had to abandon his dispute efforts for the better part of a year just to manage his other personal affairs.

194.   As Plaintiff is self-employed, his time is limited and particularly valuable to him.  It has taken him an incredible amount of time to document events, secure his credit, and track down supporting documents, all of which affected his ability to spend time on his business.

195.   In addition to impacting his work productivity and income, dealing with the consequences of Defendants' conduct has taken Plaintiff away from time he would otherwise have spent with his friends and family.  It has taken a toll on Plaintiff.

196.   Defendants' conduct has caused Plaintiff extreme and ongoing stress and anxiety.  Plaintiff has suffered sleepless nights, frustration, worry, and ultimately felt utterly hopeless that Defendants would ever properly reinvestigate his disputes. Further, Plaintiff reasonably believes that the fraudulent inquiries have negatively impacted and depressed his credit score.  Plaintiff was hoping to refinance his home mortgage, but after the Defendants failed to remove the fraudulent inquiries, Plaintiff feared his credit score was no longer good enough to qualify him for desirable refinance terms and ultimately his interest in the refinance was frustrated by the

inaccurate reporting and he sold his home instead.

197.   At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

198.   At all times pertinent hereto, the conduct of Defendants, as well as that of their representative agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

199.   After initially learning of the identity theft, Plaintiff did all the right things to protect himself and to ensure his credit file was secure and even going so far as to ensure no potential creditor lost funds due to identity theft.

200.   To keep himself safe, Plaintiff has repeatedly requested that Defendant Equifax add a fraud alert to his credit file, specifically one that would last longer than a year.  Despite his numerous requests, and Defendant Equifax's concession that Plaintiff was disputing inquiries that were the product of fraud, at most and only as of 2023, did Defendant Equifax bother to add a 1-year fraud alert to Plaintiff's credit file.

201.   Given that Plaintiff had done literally everything he could to protect

himself following the identity theft, he has no faith in Defendant Equifax, and constantly feels that another attack could come at any time.

202.  Plaintiff remains ever concerned that identity theft could visit him again.  Not only that, but that this time the identity thief would go beyond inquiries and possibly successfully secure credit in Plaintiff's name, no thanks to Defendant Equifax.

203.  Plaintiff's ongoing stress and anxiety over the situation, and after repeatedly receiving one non-responsive communication after another from Defendant Equifax, Plaintiff feels a surge of panic each time he receives another communication from Defendant Equifax.  His ongoing stress and anxiety regarding the situation has affected him and his relationships negatively.

204.  Defendant Equifax has a long history of disregarding the credit reporting rights of identity theft victims under the FCRA.  For example, in the very similar matter of *April Hendrix vs. Equifax, et. al.*, (N.CM.D. C.A. No. 1-16-cv-201), an identity theft victim sued several CRAs, including Defendant Equifax, over their repeated wrongful removal of security freezes, release of her credit reports for impermissible purposes, and refusal to properly reinvestigate disputed identity theft information on her credit reports.

205.  The *Hendrix* suit put Defendant Equifax on notice several years ago

that its policies and procedures for implementing security freezes and handling identity theft victims' requests and disputes were woefully inadequate.

206.   Defendant Equifax has had years of notice in the form of federal lawsuits, despite it all, Defendant Equifax did not take any better steps to protect the Plaintiff here.

207.   The internal policies and procedures of Defendant Equifax do not appear to place any value on its obligations under the FCRA to report credit entries accurately, to reinvestigate carefully when notified of consumer disputes, and to avoid giving third parties access to consumers' reports without authorization or permissible purpose. Nor do Defendant Equifax's policies and procedures respect its statutory duties to enforce or at minimum add security freezes and fraud alerts as requested by the consumer.

208.   As a standard practice, Defendant Equifax does not conduct independent investigations in response to consumer disputes.  Instead, it merely parrots the response of the data furnishers, like Defendants Sheffield Financial and SSFCU here, despite numerous court decisions admonishing this practice.  See *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources.  Therefore, a 'reinvestigation'

that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

209.   The Defendants are aware of the shortcomings of their respective procedures and intentionally choose not to comply with the FCRA to lower their costs.  Accordingly, the Defendants' violations of the FCRA are willful.

210.   Defendants' policies and procedures clearly establish willfulness, wantonness, and utter and reckless disregard for the rights and interests of consumers and led directly to the injuries of Plaintiff as described in this complaint.

211.   As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the inquiries which were the product of identity theft.

212.   Additionally, Plaintiff suffers interference with daily activities, as well

as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Defendants.

**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to**
**Assure Maximum Possible Accuracy**
**(Defendant Equifax Only)**

213.   Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein.

214.   The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

215.   On numerous occasions, Defendant Equifax prepared patently false consumer reports concerning Plaintiff.

216.   Despite actual and implied knowledge that Plaintiff was the victim of identity theft, Defendant Equifax readily and repeatedly sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately,

—

Plaintiff's creditworthiness by suggesting that Plaintiff was applying for multiple lines of credit.

217.   Further, because those fraudulent credit applications, namely Sheffield Financial, SSFCU, and OneMain did not result in an open account, a third party reviewing those reports would reasonably infer that Plaintiff was denied credit by those creditors.

218.   Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

219.   As a result of Defendant Equifax' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the inquiries which were the product of identity theft.

220.   Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish

and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Defendant Equifax.

221.   Defendant Equifax's conduct, actions, and inactions were willful, rendering Defendant Equifax liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendant Equifax was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

222.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
### 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (Defendant Equifax Only)

223.   Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein at length.

224.   The FCRA mandates that a CRA conduct an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. See 15

U.S.C. § 1681i(a)(1).  The Act imposes a 30-day limitation for the completion of such an investigation. Id.

225.   The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file.  See 15 U.S.C. § 1681i(a)(5)(A).

226.   On numerous occasions during 2021 and 2023, Plaintiff disputed the inaccurate information with Defendant Equifax and requested that they correct and/or delete a specific item in his credit file that is patently inaccurate, misleading, and highly damaging to him, namely, the fraudulent inquiries that were the product of identity theft which was a very stressful situation for the Plaintiff.

227.   Plaintiff disputed the identity theft information to Defendant Equifax by phone, by letter, and by online submission, to no avail.

228.   Plaintiff supported his disputes with a copy of the police report and an FTC ID Theft Affidavit.

229.   Further, in or around January 2023, Defendant Equifax removed the OneMain inquiry, which was the third inquiry that Plaintiff disputed as the product of identity theft.

230.   Despite actual and implied knowledge that Plaintiff was the victim of

identity theft, and in response to Plaintiff's phone, online, and letter disputes, Defendant Equifax conducted virtually no investigations of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

231.    Plaintiff expended resources in the form of time and money to repeatedly dispute the same inquiries with Defendant Equifax, repeatedly.

232.    Defendant Equifax's "reinvestigations," were rendered that much more deficient considering its contemporaries, Experian and Trans Union deleted the same disputed information upon Plaintiff's first dispute and certainly in a far more reduced timeline.

233.    Defendant Equifax's refusal to delete the identity theft inquiries provided credibility to those inquiries, forcing an identity theft victim to be repeatedly confronted with the evidence of identity theft.

234.    Defendant Equifax violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in

Plaintiff's credit file.

235.  As a result of Defendant Equifax' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the inquiries which were the product of identity theft.

236.  Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Defendant Equifax.

237.  Defendant Equifax's conduct, actions, and inactions were willful, rendering Defendant Equifax liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendant Equifax was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

238.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT III
### 15 U.S.C. § 1681c-1
### Failure to Prevent Identity Theft
### (Defendant Equifax Only)

239.   Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein at length.

240.   Defendant Equifax violated 15 U.S.C. § 1681c-1 by failing to include a fraud alert in Plaintiff's consumer file on the date of Plaintiff's initial request and Defendant failed to circulate information regarding the fraud alert to the other consumer reporting agencies. Further, Defendant Equifax violated 15 U.S.C. § 1681c-1 by failing to include a fraud alert in Plaintiff's consumer file on the date of Plaintiff's initial request for a period of not less than 7-years.

241.   Plaintiff repeatedly requested that Defendant Equifax add a fraud alert to his file to prevent any future occurrence of identity theft.

242.   Specifically, Plaintiff requested that Defendant Equifax add a fraud alert that would be ongoing, rather than the ineffective one-year alert.

243.   Despite Plaintiff's repeated and well documented requests, Defendant Equifax failed to add a fraud alert to Plaintiff's file not until January 2023, even

though he requested that relief from the outset in August 2021.

244.  As a result of Defendant Equifax' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the inquiries which were the product of identity theft.

245.  Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Defendant Equifax.

246.  Defendant Equifax's conduct, actions, and inactions were willful, rendering Defendant Equifax liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendant Equifax was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

247.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT IV
### 15 U.S.C. § 1681c-2
### Failure to Block Identity Theft Information
### (Defendant Equifax Only)

248.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

249.    Defendant Equifax violated 15 U.S.C. § 1681c-2 by failing to block the reporting of the disputed information which was due to identity theft from Plaintiff's file.

250.    Plaintiff repeatedly submitted ample evidence of the fact that he was an identity theft victim.  Going so far as to informing Defendant Equifax that the identity thief was arrested and serving out a jail sentence for his crime.  Plaintiff further supported the fact that he was an identity theft victim by providing to Defendant Equifax a Police Report and FTC ID Theft Affidavit.

251.    Further, in or around January 2023, Defendant Equifax removed the OneMain inquiry, which was the third inquiry that Plaintiff disputed as the product of identity theft.

252.    Defendant Equifax should have blocked the identity theft inquiries but

failed to do so at every turn.

253.   As a result of Defendant Equifax' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the inquiries which were the product of identity theft.

254.   Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the Defendant Equifax.

255.   Defendant Equifax's conduct, actions, and inactions were willful, rendering Defendant Equifax liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendant Equifax was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

256.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT V**
**15 U.S.C. § 1681s-2b**
**Failure to Conduct an Investigation of the Disputed Information and Review of all Relevant Information Provided by the Consumer**
**(Defendants Sheffield Financial and SSFCU Only)**

257.    Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein at length.

258.    Defendants Sheffield Financial and SSFCU accessed Plaintiff's credit file in response to a fraudulent credit application submitted by an identity thief.

259.    Defendants Sheffield Financial and SSFCU caused an inquiry to be added to Plaintiff's credit file with the national credit bureaus, including but not limited to Defendant Equifax.  That inquiry was the product of identity theft.

260.    Defendant Sheffield Financial violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's dispute(s), or otherwise by failing to fully and properly investigate Plaintiff's dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not

limited to Defendant Equifax; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Defendant Equifax.

261. Defendant SSFCU violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's dispute(s), or otherwise by failing to fully and properly investigate Plaintiff's dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Defendant Equifax; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Defendant Equifax.

262. As a result of Defendant Sheffield Financials' and SSFCU's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the inquiries which were the product of identity theft.

263.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by Defendants Sheffield Financial and SSFCU.

264.    Defendant Sheffield Financials' and SSFCU's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

265.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Sheffield Financial and SSFCU in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

(a)    WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant the following relief against Defendants: Declaratory judgment that Defendants violated the FCRA, 15 U.S.C. § 1681;

(b)    An award of actual, statutory, and punitive damages pursuant to 15

U.S.C. §§ 1681, *et seq.;*

(c)     An award of costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n and § 1681o; and,

(d)     Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## **JURY DEMAND**

Plaintiff hereby demands jury trial on all issues so triable.

RESPECTFULLY SUBMITTED this 6th day of March 2023,

> */s/ Sylvia Bolos*
> Sylvia Bolos MI Bar No. P78715
> **Consumer Attorneys**
> 8245 N. 85th Way
> Scottsdale, AZ 85258
> T: (718) 701-3106
> E: sbolos@consumerattorneys.com
>
> Attorney for Plaintiff
> *Zechariah Jones*